UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO. 00-6309-Cr-SEITZ (s)(s)/Garber

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

JOHN O'SULLIVAN, et al.,

    Defendant.

_____/

**DEFENDANT JOHN O'SULLIVAN'S OBJECTIONS TO THE PRE-SENTENCE INVESTIGATION REPORT AND MEMORANDUM IN SUPPORT**

The defendant, JOHN O'SULLIVAN, by and through undersigned counsel, respectfully submits his objections to the pre-sentence investigation report (PSI) and in support thereof says the following:

**A.**    **Objection to the Offense Level determination.**

The Defendant disputes the total Offense Level calculation in the PSI which placed the Defendant at a level 20 after reducing the Defendant's Offense from level 23 for acceptance of responsibility. The Defendant specifically objects to the method used by the probation office to score the offense level for the predicate acts.

1

Under U.S.S.G. §2E1.1, the base offense for a RICO offense is the greater of 19 or the offense level applicable to the underlying racketeering activity. In this case the underlying racketeering activity that carries the greatest offense level is the extortion offense, with an offense level of 20. U.S.S.G. §3E2.1.

The Defendant agrees with the PSI determination that the Guidelines require separate grouping for each of the underlying racketeering activities pursuant to §3D1.2 of the guidelines. See U.S.S.G. §2E1.1, comment. (n.1) and *United States v. Nguyen*, 255 F.3d 1335 (11th Cir. 2001). However, the Defendant disputes the method used by the PSI in scoring the two remaining racketeering activities at level 19. The predicate activities should have been scored according to the applicable offense level and then grouped separately pursuant to §3D1.1. *See United States v. Nguyen,* 255 F.3d at 1344 ("The plain language of the Guidelines therefore clearly indicates that a sentencing court must apply the grouping rules, where applicable, to determine a defendant's offense level for underlying racketeering conduct.") Counsel spoke with Mr. Alan Dorhoffer through the United States Sentencing Commission "Helpline" for assistance with this issue, and Mr. Dorhoffer advised counsel that the correct application of the Guidelines is to score each predicate act under the Guidelines offense level and not offense level 19.

Section 3D1.3 requires a determination of the offense level for each of the groups. Here there are three groups as set forth in the PSI. The first group, extortion, should have an offense level of 20. Receiving stolen goods should have an offense level of 8, under §2B1.1 of the guidelines, assuming a loss valuation between $5,000 and $10,000. Under §2J1.2 of the guidelines obstruction of justice should result in an offense level of 12.

Under the grouping provisions of §3D1.4, the guidelines total Offense Level should

be calculated as follows: Group one: adjusted offense level of 20; Group two: adjusted offense level of 8; Group three: adjusted offense level of 12. Group one receives 1 unit and group three receives ½ unit for a total of 1 ½ units. Under §3D1.4, the offense level is increased by one level for an adjusted offense level of 21. Reducing the offense level by three levels for acceptance of responsibility, gives the Defendant a total offense level of 18.

**B.    Adjustment for Role in the Offense.**

The Defendant objects to the Defendant's Role Assessment and the failure of the PSI to adjust the Defendant's role for having a minimal role in this conspiracy. The Defendant's role in the RICO conspiracy was minimal when compared to other participants in this RICO offense, and the Defendant is entitled to a four level downward adjustment for his minimal participation in the criminal activity under U.S.S.G. §3B1.2, the Mitigating Role provision of the Guidelines. This section provides for the following adjustments.

> Based on the defendant's role in the offense, decrease the offense level as follows:
>
> (a)    If the defendant was a minimal participant in any criminal activity, decrease by **4** levels.
>
> (b)    If the defendant was a minor participant in any criminal activity, decrease by **2** levels.
>
> In cases falling between (a) and (b), decrease by **3** levels.

U.S.S.G. §3B1.2.

Application Note four of this guideline explains that a minimal participant role reduction is intended to apply to Defendants that are the least culpable of those involved

in the criminal activity of a group.

> <u>Minimal participant</u> - Subsection (a) applies to a Defendant described in application note 3(A) who plays a minimal role in concerted activity. It is intended to cover Defendants who are plainly among the least culpable of those involved in the conduct of a group. Under this provision, the Defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant. It is intended that the downward adjustment for a minimal participant will be used infrequently.

U.S.S.G. § 3B1.2, Comment. (n.4).

The Defendant's involvement in the instant case was minimal compared to the overall scope and size of this RICO conspiracy considering the significant roles played by most other participants. The Defendant's role was substantially less important. In view of the overall scope and size of the conspiracy, the Defendant's role was among the most minimal of the conspirators.

The Defendant became involved in this conspiracy after November 2000, following the first indictment and while John Mamone was on house arrest. The Defendant knew John Mamone from coaching in the youth leagues where Mamone's son also participated. They became friendly through their sons' sports activity. Because the Defendant was not working, he began to spend more time at Mamone's house while Mamone was on house arrest and he began doing favors for Mamone. Eventually, Mamone asked the Defendant to help him collect some money that co-defendant Jeffrey Bass owed Mamone. The money was a debt owed to Mamone for Bass' gambling debts. At some point later, Bass borrowed an additional $6,000 from Mamone which the Defendant gave to Bass.

The obstruction of justice predicate act involved Jeffrey Bass who at the time was cooperating with the Government. There were several tape recorded conversations in

which Bass discussed with the Defendant how he should resolve his case. At some point, the Defendant tried to dissuade Bass from cooperating with the authorities.

According to the allegations of the indictment and offense conduct outlined in the PSI, the racketeering activities committed by the co-conspirators began in 1997 and extended deeply into a variety of criminal RICO activities that were far more extensive than the activities in which the Defendant became involved. The defendant played no part in the vast majority of the activities and his introduction into the conspiracy came after these activities had for the most part ended.

The PSI outlines three major areas of criminal activity in this RICO conspiracy. It first described a telemarketing fraud scheme that used boiler rooms in South Florida and New York run by co-conspirators, Joseph Spitaleri and John Mamone, who used numerous salespersons to defraud prospective investors by telephone. According to the PSI, the foreign currency exchange scheme was one of the most successful schemes. (PSI at ¶¶15 and 16). The boiler room activities violated bank fraud, mail fraud, and wire fraud laws. Losses resulting from the foreign currency investment fraud totaled about 4 million dollars. PSI at ¶ 18.

The proceeds of this telemarketing fraud were laundered through check cashing stores which were operated by Mamone and other co-conspirators such as Julius Chiusano, Irving Weiss and Fred Morgenstern. The investor's checks were negotiated through the Check Cashing Unlimited, Check Cashing Unlimited II, and Akel's Market. PSI at ¶¶18, 19, and 24. In addition to money laundering investment fraud funds, the Check Cashing Store was also structuring financial transactions in excess of $10,000 to avoid the CTR filing requirements. The Defendant played no part in any of these activities and had

no knowledge of these activities that ended by the time the Defendant began participating in this conspiracy.

In 1999, certain co-conspirators became involved in another investment fraud scheme out of South Carolina in which the proceeds were sent to the Check Cashing Stores in South Florida. According to the PSI, Co-Defendants David and Fred Morgenstern received approximately $30 million dollars from this fraud and a substantial portion was laundered in foreign bank accounts. Co-Defendant Mamone received approximately $1,046,451 of investor checks that he unsuccessfully attempted to negotiate at Akel's market. PSI at ¶¶ 25-31. The Defendant played no part in this scheme that occurred before he entered the conspiracy.

The illegal gambling operation was another significant aspect of the racketeering activities which consisted of sports betting and high-stakes card games. The card games took place at the Café Sportivo, operated by Giuseppe Bellitto under the direction of Steve Raffa from 1995 to October 2000. Besides managing the Café Sportivo, Bellitto also assisted in collecting from losing betters. PSI at ¶ 42. The conspiracy also operated a sports bookmaking operation involving numerous bookmakers who reported to Co-Defendants Steve Raffa and John Mamone. Among the bookmakers were Jeffrey Bass, Ralph Lento, Jacolyn Baruch, Mark Carattini, Al Polito, and Giuseppe Bellitto. Some of these bookmakers such as Bass and Baruch employed over five persons in their operation. PSI at ¶¶ 43,45. They operated these illegal gambling operations from 1997 to January 2001 under the protection of John Mamone. Mamone lent Bass funds for the operation of his bookmaking business and assisted Bass in collecting gambling debts. Mamone also

controlled Bass' bookmaking business by setting betting limits and approving new betters. PSI at ¶ 43.

The Defendant did not participate in these bookmaking and illegal gambling activities. The Defendant played no part in the illegal gambling operation at Café Sportiva. He played no role in the bookmaking operation controlled by Mamone. According to paragraph 46, loan shark collections were made by Mamone, Buccina, Russo, and others beginning in 1997. To the extent that the Defendant was involved in collecting an extortionate loan from co-defendant Jeffrey Bass, his participation began in late 2000 and was minimal when compared to the extensive loan shark and collection activities by John Mamone and the other Defendants. According to paragraph 46, the co-conspirators used the check cashing store to collect the proceeds and hide the illegal activities. The defendant played no part in the check cashing stores. Though the Defendant was aware of Bass' gambling activities, the Defendant played no part in any bookmaking operation nor was he aware of the full extent of the gambling business that the enterprise conducted. The Defendant had no contact with that aspect of the conspiracy.

The amount that the Defendant collected from co-defendant Bass was significantly less than the amount of money that changed hands before the Defendant's involvement. Mamone himself was responsible for collecting $500,000 in extortionate loans. Bass borrowed nearly $400,000 from Mamone, which Bass paid through a friend. However, the Defendant was only involved in collecting an outstanding debt of approximately $20,000 which was later increased by approximately $6,000. Overall, the Defendant collected between $3,000 to $4,000 from Bass which was a small percentage of the overall money that had been previously owed to and collected by Mamone. The Defendant had no role

in any of the earlier collections from Bass nor did he play any role in the collection of extortionate loans from other individuals who owed money to Mamone or the enterprise. Bass was the only loan shark debtor from whom the Defendant collected money.

The Defendant played no role in any of the criminal activities involving financial fraud or the money laundering aspect of the financial fraud. Indeed, it appears that the gambling business ended with the first Indictment, before the Defendant's involvement in this conspiracy began. In essence, the Defendant's role was limited to collecting money from Bass and his involvement in attempting to dissuade Bass from cooperating with the authorities.

As the last person to become involved in this conspiracy, the Defendant had a very limited involvement and a lack of knowledge and understanding of the scope and structure of the enterprise. His limited activities do indicate that his role was minimal. His involvement did not reach any further than these limited activities and the scope of his involvement came at the very end of the conspiracy after other activities no longer existed. For these reason, the Defendant should be entitled to a four level minimal role adjustment.

**C.   Specific objections to factual statements of the PSI.**

1. The Defendant objects to the statement in paragraph 52 that the amount the Defendant collected from Bass was several thousand dollars. A more accurate statement would be that he collected between 3 and 4 thousand dollars from Bass.

2. The Defendant objects to the statement in paragraph 68 that the Defendant attempted to dissuade other co-conspirators from cooperating. The Defendant attempted to dissuade only one co-conspirator, Jeffrey Bass.

3. The Defendant objects to the statement in paragraph 68 that the Defendant

received stolen property from Gateway Transportation. The Defendant received the proceeds of stolen property from David Bell which he turned over to Mamone.

D.  **Assets and Liabilities**

Under the item "Unsecured Debts" the secured line of credit (Bank of America) balance should be $23,000 rather than $11,5000. This should reduce the Defendant's net worth accordingly.

Respectfully submitted,

LAW OFFICES OF KENNETH M. SWARTZ, P.A.
New World Tower, Suite 2100
100 N. Biscayne Boulevard
Miami, Florida 33132-2306
Tel: 305-579-9090/Fax: 305-371-4380

By: _____
KENNETH M. SWARTZ
Florida Bar No. 331929

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been served via U.S. Mail this 3 day of June, 2002, upon Brian McCormick and Diane Fernandez, Assistant United States Attorneys, 500 E. Broward Blvd. Suite 700, Ft. Lauderdale, FL 33394 and Tom Felasco, USPO, 300 NE 1st Ave., Ste. 315, Miami, FL 33132-2126.

_____
Kenneth M. Swartz